#78

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LIGHT SOURCES, INC., and
TAN SYSTEMS, INC.,
        Plaintiffs

v.

                            Civil Action
                            No. 303 CV 874 (MRK)

                            At New Haven
COSMEDICO LIGHT, INC.,
        Defendant           September 22, 2004


**REDACTED PUBLIC VERSION**
of
REPLY APPENDIX
TO
PLAINTIFFS' JOINT REPLY MEMORANDUM
TO DEFENDANT'S MEMORANDUM IN OPPOSITION
TO
PLAINTIFFS' JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT


Arthur T. Fattibene
Paul A. Fattibene
Fattibene & Fattibene
2480 Post Road
Southport, CT 06890-1218

# REPLY APPENDIX
## TABLE OF CONTENTS

|  | Page No. |
|---|---|
| Court's Modification Order of December 17, 2003 | RA-1, 2 |
| Declaration of Kristen Tiffany Crumpler | RA-3-5 |
| Deposition Testimony of Jerry Frank | RA-6-9 |
| Cosmedico Letter to Tan Systems dated September 25, 2003 | RA-10 |
| Bumble Bee Seafood LLC v. UFS Industry, Inc. 71 USPQ 2d 1684 (SDNY 2004) | RA-11-14 |
| Cosmedico Royal Sun VLR/VHR Private Label Agreement | RA-15, 16 |
| Deposition Testimony of Jerry Frank | RA-17-26 |

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LIGHT SOURCES, INC.,
and TAN SYSTEMS, INC.

    Plaintiffs,    :  NO. 3:03CV874(MRK)

v.

COSMEDICO LIGHT, INC.,

    Defendant.

## ORDER

  The Parties' Stipulated Protective Order [doc. #29] is GRANTED with the exception of Paragraph #14 and any other stipulation regarding Court Proceedings. If either party wants to designate anything filed with the Court as confidential and place it under seal, that party will have to make a separate motion, specifying precisely what is to be kept under seal and demonstrating good cause as to why the Court should depart from the strong presumption against sealing any court records to public inspection. *See Nixon v. Warner Comm., Inc.*, 435 U.S. 589, 579-99 (1978); *Video Software Dealers Assoc. v. Orion Pictures, Corp. (In re Orion Pictures Corp.)*, 21 F.3d 24, 26 (2d Cir. 1994).

  In limited circumstances and upon a showing of compelling circumstances, this Court may order certain records to be sealed. However, "[i]n most cases, a judge must carefully and skeptically review sealing requests to insure that there really is an extraordinary circumstance or compelling need." *Id.* at 27 (citation omitted). Moreover, ordinarily, a court must make that determination on the basis of a careful document-by-document review. A blanket sealing order such as that requested

RA-1

in Paragraph 14 would rarely, if ever, be appropriate. Until either party demonstrates the existence of an extraordinary circumstance or compelling need to seal from public view any specific document filed in this case, this Court will not depart from its governing presumption of open access.

IT IS SO ORDERED.

Hon. Mark R. Kravitz, U.S.D.J.

Dated at New Haven, Connecticut: December 17, 2003.

RA-2

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LIGHT SOURCES, INC., and
TAN SYSTEMS, INC.,
        Plaintiffs

v.                                              Civil Action
                                                No. 303 CV 874 (MRK)
                                                At New Haven

COSMEDICO LIGHT, INC.,
        Defendant                   September 20, 2004

## DECLARATION OF
## KRISTEN TIFFANY CRUMPLER

I, KRISTEN TIFFANY CRUMPLER, hereby declare that I functioned as the President of Tan Systems and that I am personally knowledgeable of the facts herein and if called to testify, I would so testify.

1. Attached Exhibit A is a copy of page number 22/2k3 of Tan Systems' 2003 catalog, in which I was instrumentally involved with the preparation of Tan Systems' 2003 catalog.

2. The photograph of the lamp appearing on the right side of page superimposed on a picture of a model is an actual photo of a Tan Systems TurbOPower TVR 180 (a mark not in suit) lamp supplied by Light Sources. This lamp contained only the etch as shown.

3. The TurbOPower lamps which Light Sources supplied to Tan Systems always had only the one single etch, bearing the THR 160 and TLR 100 mark similar to that shown in the photo on the right side of the attached page 22.

RA-3

1

4. The photographs of five lamps illustrated on the left side of page 22 was the result of a mock-up photograph for advertising purposes to clearly show a lamp with a legible Tan Systems' TurboPower THR stylized mark.

5. The mock-up photograph on the left side of the page of attached page 22 was prepared for the reason that the photograph of the actual lamp supplied by Light Sources did not legibly photograph Tan Systems' TurboPower mark.

6. At no time did Light Sources or Tan Systems apply an etch to the right side of the lamp or market a lamp as depicted on the mock-up left hand photo of attached page 22.

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under section 1001 of Title 18 of the United States Code.

_____
KRISTEN TIFFANY CRUMPLER

Dated: September    , 2004

RA-4



# turboPower® Reflector

TurboPower®
Reflector Lamps

Introducing the newest, hottest technology in reflector lamps.

TurboPower® lamps contain T-SPAN™ phosphor technology with stabilizers that will out-tan & out-last any reflector lamp on the market today.

T-SPAN™ phosphor not only maximizes the melanin production of the tanner, but it utilizes the "mirror" created by the built-in lamp reflector to double the Tanning Per Square Inch achieved by standard lamps.

A Revolution in Lamp Technology. Cutting edge for Raw Tanning Power & higher profits.



TurboPower TLR™ 100 watt "Turbo Lite Reflector" F71

TurboPower THR™ 160 watt "Turbo High Output Reflector" F71

TurboPower TVR™ 200 watt "Turbo Very High Output Reflector" 2 m



Call 1-800-999-
www.tansystems

**24** | 2k3

EXHIBIT A     RA-5

1

```
                              Volume I
                              Pages 1 to 203
                              Exhibits 1 to 30
```

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - -x
                                  :
LIGHT SOURCES, INC., and TAN      :
SYSTEMS, INC.,                    :
        Plaintiffs,               :
                                  :  C.A. No.
        vs.                       :  303 CV 874 (MRK)
                                  :
COSMEDICO LIGHT, INC.,            :
        Defendant.                :
                                  :
- - - - - - - - - - - - - - - - -x

CONFIDENTIAL DEPOSITION OF COSMEDICO LIGHT, INC., THROUGH ITS DESIGNEE, JOSEPH J. FRANK, a witness called on behalf of the Plaintiffs, taken pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, before Ken A. DiFraia, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Banner & Witcoff, LTD., 28 State Street, Boston, Massachusetts, on Monday, July 19, 2004, commencing at 10:07 a.m.

PRESENT:

   Fattibene and Fattibene
        (by Arthur Fattibene, Esq., and
        Paul A. Fattibene, Esq.)
        2480 Post Road, Southport, CT 06890,
        for the Plaintiffs.

   Banner & Witcoff, LTD.
        (by Dale A. Malone, Esq.)
        28 State Street, Boston, MA 02109-1775,
        for the Defendant.

                    * * * * *

WONG Associates, Inc.
Professional Court Reporters
50 Franklin Street
Boston, Massachusetts 02110
(617) 426-2432 ~ Fax (617) 482-7813
Since 1987

RA-6

16

1  "Cosmedico Light," I'm talking about the U.S.
2  company. Are we on the same track on that?
3      A.   Yes.
4      Q.   Do they manufacture any types of lamps?
5      A.   No.
6      Q.   What is Cosmedico Light's main business?
7      A.   It's the supply of tanning lamps, ballasts,
8  starters and associated products to the tanning
9  industry.
10     Q.   When you say "associated products to the
11 tanning industry," is that just limited to the lamp
12 itself?
13     A.   No. There are a number of odds and ends
14 products that we offer, socket adapters, sockets,
15 UV meters, but our primary business is low pressure
16 lamps, transformers, starters, high pressure lamps.
17     Q.   Who supplies Cosmedico Light with the
18 actual physical lamps?
19          MR. MALONE:  Objection to the form of the
20 question.
21     A.   We have several suppliers. Your question
22 is relating to lamps alone?
23     Q.   Primarily, suntanning lamps.
24          MR. MALONE:  Are you talking about all

22

1  instruction?
2     A.    Oh, yes.
3        MR. MALONE:  You may answer with respect to
4  the products in suit.
5     A.    What we're talking about specifically are
6  VHR and VLR lamps?  The question was regarding these
7  lamps?  I guess that I would like a definition of
8  "these."
9     Q.    No, no.  Your attorney said you are to
10 answer limited to these lamps.  Now I don't know
11 what lamps he has in mind.
12       MR. MALONE:  As I said earlier, it's the
13 lamps involved in the lawsuit, which are the VHR
14 lamps.
15    A.    Those lamps are manufactured by Osram
16 Sylvania.
17    Q.    Could you tell me what lamps are involved
18 in this lawsuit, what Cosmedico lamps are involved
19 in this lawsuit.
20       MR. MALONE:  I object to that question.  It
21 calls for a legal conclusion.
22       I mean, literally the products involved in
23 the suit are not Cosmedico products.  We have
24 Cosmedico trademarks involved in the suit that are

RA-8

1  A.   (Witness reviews document) Yes.

2  Q.   What is it?

3  A.   It's our registered trademark VHR.

4  Q.   Have you ever applied the mark VHR to any
5  lamp that Cosmedico sells without using the word
6  "CosmoLux," or the term "CosmoLux"?

7  MR. MALONE: Objection to the form of the
8  question.

9  A.   The current product VHR is not used alone
10 on the labeling of the current product.

11 I can't answer for previous versions of the
12 VHR mark when it was first produced in 1991. I
13 don't have copies of that artwork, carton or etch
14 artwork.

15 Q.   Of your own knowledge, are you aware of any
16 lamp that you know of that bore just the VHR mark?

17 A.   I can't answer that question. The products
18 may have been called --

19 Q.   No. I'm talking about your own knowledge
20 in 1996.

21 A.   Not to my knowledge. I think we have
22 always designated it as "Cosmedico" or "CosmoLux,"
23 on the lamp itself.

24 Q.   Looking at Exhibit No. 2, can you ascertain



Cosmedico Light, Inc.
233 Libbey Pkwy., Unit 2
Weymouth, MA 02189-3101
781-331-0949 / phone
781-331-4766 / fax
jjfrank@cosmedico.com
www.cosmedico.com

September 25, 2003

Ms. Kristin Tiffany, CEO
Tan Systems, Inc.
1920 Highway 42 South
McDonough, Georgia 30252-7631

Dear Ms. Tiffany:

In view of your continued use of the trademarks THR/TLR, which infringe on our trademarks VHR/VLR, Cosmedico has decided to end our long standing business relationship.

Effective immediately we will no longer accept any orders from Tan Systems, Inc.

Respectfully,

Jerry Frank, President
COSMEDICO LIGHT

CC:  Dale A. Malone, Esquire

CERTIFIED MAIL/RETURN RECEIPT
#7000 0600 0024 1766 0955

RA-10

summary judgment on this point as well. *See Hilgraeve Corp.*, 224 F.3d at 1352-54.

III.

Because genuine issues of material fact preclude summary judgment of noninfringement of the '532 patent, this court vacates and remands.

## COSTS

Each party shall bear its own costs.

## VACATED AND REMANDED.

Newman, J., dissenting.

I respectfully dissent from the panel's decision to remand this case for the third time on the issue of claim construction with respect to the claim term "layer." Claim construction is a matter of law, and as such it receives *de novo* review. The purpose is objective correctness; the record is complete, the question is ripe. It is time for decision, not for remand.

There have been three *Markman* hearings and now three appeals, all directed to the meaning of the term "layer." For the first two hearings the definition was applied to the titanium dioxide deposits, and in the second appeal this court held that a layer is a material of optically significant uniform chemical composition. In the third *Markman* hearing the district court held the Cardinal's multiple deposits of its center zinc oxide component produced multiple layers. This court now appears to hold that its definition in the previous appeal, wherein "layer" was defined in the context of the "interlayers" of titanium dioxide, bars the district court from considering the additional aspect of whether multiple sputtering deposits can produce multiple "layers," unless they affect the structure and optical properties. However, when the later claim construction is made in a different technical context, it is not from that which was earlier considered, in the interest of correctness the court must consider the new context.

This case was filed in 1996. Before the district court the parties produced extensive evidence, in the form of expert and other witness testimony, and physical exhibits and demonstrations. The district court has three times held, on summary judgment upon deciding the legal question of claim construction, that there is no infringement. It is a relatively simple technical question, for which the record is fully developed. After eight years this question of law required finality, not a fourth cycle of *Markman* hearing and appeal. From my colleagues' remand for this purpose, I respectfully dissent.

---

## Bumble Bee Seafoods LLC v. UFS Industries Inc.

U.S. District Court
Southern District of New York

No. 04 Civ. 2105 (SHS)

Decided July 20, 2004

### TRADEMARKS AND UNFAIR TRADE PRACTICES

[1] Infringement; conflicts between marks — Likelihood of confusion — Particular marks — Confusion not likely (§ 335.0304.05)

Infringement; conflicts between marks — Defenses — Fair use (§ 335.1003)

Manufacturer of composite product that includes trademarked product as component thereof may use component product's mark to announce existence of that component in its product, regardless of composite product's quality as compared with component product, provided use of mark is not deceptive as to source or endorsement in present case, defendant's use of label on its tuna salad tubs truthfully stating "Made with Bumble Bee Tuna," and since tubs contain "Bumble Bee Tuna Salad," and since buyers of tubs, which are sold exclusively to delicatessens and supermarkets where product is removed from lidded tubs for sale in smaller quantities to ultimate consumers, are sufficiently sophisticated to understand that tuna salad is producer thereof, and since delicatessen and supermarket buyers, who purchase tuna salad in tubs for resale in smaller quantities, are sufficiently sophisticated to understand that defendant, and not plaintiff, manufactures composite product.

[2] Acquisition, assignment, and maintenance of marks — Scope of trademark — As to goods/services (§ 305.0203)

Plaintiff owner of "Bumble Bee Tuna" mark cannot assert quality control rights in

---

defendant's composite product that incorporates plaintiff's product as component, even though labels on defendant's tuna salad product state "Made with Bumble Bee Tuna," since defendant did not simply repackage and resell plaintiff's product, but instead blended it with numerous additional ingredients to make tuna salad, since any adverse inference to be drawn by consumers as to tuna salad's quality would be directed toward defendant, not plaintiff, and since plaintiff may not exert quality control as its tuna moves "downstream" in market and becomes one ingredient in other products.

[3] Infringement; conflicts between marks — Likelihood of confusion — Particular marks — Confusion not likely (§ 335.0304.05)

Application of likelihood of confusion factors to defendant's use of plaintiff's "Bumble Bee Tuna" mark on label for tuna salad, which truthfully states that defendant's product is "Made with Bumble Bee Tuna," does not compel finding that consumers are likely to be confused as to source or endorsement of defendant's product, since factors addressing mark strength and similarity of parties' marks are irrelevant, in that defendant admits use of plaintiff's actual trademark and asserts legal right to do so, since close relationship of goods weighs "proximity" factor in favor of plaintiff, but there is no evidence of actual confusion or of defendant's intention to "bridge the gap," since bad faith cannot be inferred from defendant's decisions not to participate in plaintiff's quality assurance program, and to continue using label despite plaintiff's demands, since any difference in quality between parties' products is irrelevant in view of plaintiff's right to announce existence of plaintiff's product as component of its tuna salad, and label's clear indication that defendant is producer thereof, and since deli-catessen and supermarket buyers, who purchase tuna salad in tubs for resale in smaller quantities, are sufficiently sophisticated to understand that defendant, not plaintiff, manufactures composite product.

---

Action by Bumble Bee Seafoods LLC against UFS Industries Inc. d/b/a Sally Sherman Foods Inc. for trademark infringement in violation of 15 U.S.C. § 1114(1), for false designations, descriptions, and representations in violation of 15 U.S.C. § 1125(a)(1), unfair competition in violation of New York common law, and trademark dilution in violation of N.Y. Gen. Bus. Law § 360-1. On plaintiff's motion for preliminary injunction. Denied.

Joshua K. Leader, of Leader & Berkon, New York, N.Y.; Nancy O. Dix, of Gray, Cary, Ware & Freidenrich, San Diego, Calif., for plaintiff.

Seth Natter, of Natter & Natter, New York, for defendant.

Stein, J.

### INTRODUCTION

Should the makers of tuna salad be preliminarily enjoined from stating on its label that it trademark to "Bumble Bee Tuna" when the by another entity? The answer, in the context of the facts of this action, is "no."

This action arises out of the use of the trademark of one manufacturer's component product on the labels of another manufacturer's composite product to advertise the presence of the former as an ingredient in the latter. Specifically, Bumble Bee Seafoods, LLC brings this action against UFS Industries, Inc. d/b/a Sally Sherman Foods, Inc. ("Sally Sherman") to enjoin Sally Sherman, a maker of tuna salad, from stating on the lids of its five-pound tuna salad containers that its salad is "Made With Bumble Bee Tuna." No one disputes Sally Sherman's tuna salad is in fact made with Bumble Bee tuna. Plaintiff asserts claims for trademark infringement in violation of 15 U.S.C. § 1114(1), false designations, descriptions, and representations in violation of 15 U.S.C. § 1125(a)(1), unfair competition in violation of New York common law, and trademark dilution in violation of N.Y. Gen. Bus. Law 360-1.

Bumble Bee seeks preliminary and permanent relief enjoining Sally Sherman from using the allegedly offending tuna salad lids as well as actual damages, treble damages pursuant to 15 U.S.C. § 1117(a), and punitive damages pursuant to New York common law. Bumble Bee has moved for a preliminary injunction and a factual hearing was held at which testimony was adduced and exhibits were admitted into evidence. Because Sally Sh[erman] is in fact using Bumble Bee tuna, and be[cause]

---

setting forth that fact on the containers as currently distributed is neither deceptive nor likely to cause confusion, plaintiff has not shown a likelihood of success on the merits. Accordingly, plaintiff's motion for a preliminary injunction is denied.

## DISCUSSION

### Background

Bumble Bee is a leading provider of tuna in the United States and owns several well-established and widely recognized trademarks "," which it has marketed its products since . Bumble Bee has created a Quality Assurance Program by which it authorizes tuna processing companies to manufacture and market tuna salad using its products and trademark infringement and dilution is a familiar one: "A party seeking a preliminary injunction must demonstrate (1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Federal Express Corp. v. Federal Espresso, Inc.*, 201 F.3d 168, 173 [53 USPQ2d 1345] (2d Cir. 2000) (citing *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 142 [43 USPQ2d 1734] (2d Cir. 1997)); *Home Box Office Inc. v. Showtime/The Movie Channel Inc.*, 832 F.2d 1311, 1314 [4 USPQ2d 1789] (2d Cir. 1987)).

### III. Bumblebee Is Not Likely to Succeed on the Merits

#### A. Defendant's Use of Plaintiff's Trademark to Announce the Existence of Plaintiff's Component Product As An Ingredient in Defendant's Composite Product Is Not Deceptive

[1] May the manufacturer of a composite product use the trademark relating to a component product to announce the existence of that component in the finished work? Ultimately, the answer depends upon whether the use is deceptive as to source or endorsement.

#### 1. Permitted Use In The Context of Component And Composite Products

In *Prestonettes, Inc. v. Coty*, 264 U.S. 359 (1924), the U.S. Supreme Court addressed a similar use of a component product's trademark in connection with the sale of a composite product. In that action, Coty had manufactured toilet powders and perfumes; Prestonettes, Inc. purchased those powders, altered them through various physical processes, and resold the new compound. The district court denied Coty's motion for a preliminary injunction and permitted Prestonettes, Inc. "to put upon the rebottled perfume 'Prestonettes, Inc.', not connected with

Coty, states that the contents are Coty's [giving the name of the article] independently rebottled in New York." In upholding that decree, the Supreme Court wrote:

> The defendant of course by virtue of its ownership had a right to compound or change what it bought to divide either the original or the modified product, and to sell it so divided. The plaintiff could not prevent or complain of its stating the nature of the component parts and the source from which they were derived if it did not use the trademark in doing so.

*Id.* at 367. Moreover, the inferiority of the latter's quality gives the component manufacturer no ground for relief. *Id.* at 368. ("If the compound was worse than the constituent, it might be a misfortune to the plaintiff, but the plaintiff would have no cause of action, as the defendant was exercising the rights of ownership and only telling the truth.").

Recognizing that trademark rights exist to "protect the owner's good will against the sale of another's product as his," and not to "prohibit the use of the word or words" as is relevant under copyright law, the Court ultimately assessed the merits of the case based upon the potential for deception. *Id.* ("When the mark is used in a way that does not deceive the public we see no such sanctity in the word as to prevent its being used to tell the truth. It is not taboo.") (citing *Canal Co. v. Clark*, 80 U.S. 311 (1871)). The Supreme Court concluded in *Prestonettes* that the plaintiff did not have "the naked right . . . to prohibit the [composite manufacturer] from making even a collateral reference to the [component manufacturer's] mark." *Id.* at 369.

Two decades later, the Supreme Court continued to approve the application of a deception standard as the litmus test for permissible use in the context of component ingredients in a composite product. *Champion Spark Plug Co. v. Sanders* involved a somewhat different, but nonetheless instructive, issue where the defendants reconditioned used spark plugs made by the plaintiff, repackaged them, and sold them bearing the plaintiff's trademark. *See* 156 F.2d 488 [70 USPQ 263] (2d Cir. 1946), *aff'd*, 331 U.S. 125 [73 USPQ 133] (1947).

The U.S. Court of Appeals for the Second Circuit in that action had emphasized that "full disclosure of the product's origin *Id.* at 492. As in the *Prestonettes* action, the relative quality of the new product was irrelevant. *Id.* ("It is therefore unimportant whether their reconditioned spark plugs were as good as the original ones, . . . but only whether the purchaser was apprized of the facts."). Moreover, a composite manufacturer is even entitled to benefit from the goodwill of the component maker as long as the "real facts" are truthfully disclosed. *Id.* ("The reconditioner "had a right to gain any advantages derived from the good name of the manufacturer so long as they made it clear that the latter was not responsible for any lack of conformity to original standards . . . .").

One oft-cited treatise on unfair competition offers the following insight regarding any potential quality differential between the component and composite products:

> If a finished article is made of parts or materials manufactured by a particular producer, who may have a special reputation for quality, the seller of the finished article is allowed to use the latter's mark to identify the source of such parts or materials, and the manufacturer of the parts or materials cannot protest on the ground that the finished article is of inferior workmanship.

Rudolf Callmann, *Callmann on Unfair Competition, Trademarks and Monopolies*,

posed no breach of trademark rights. *Id.* at 491. ("The defendants have a right to sell them as such provided they make known to the public that they are second-hand and reconditioned and that the defendants—and not the plaintiff—have repaired the original plugs."). As part of that truthful disclosure, the defendants were "also entitled to sell them with the trademark 'Champion' . . . because the mark 'Champion' shows their origin." *Id.* Summarizing the legal framework for the permissible use of another's trademark, the Second Circuit wrote:

> It is well settled by the authorities that the defendants have the right to sell an article manufactured by the plaintiff and to say that it has been so manufactured by retaining the latter's trade-mark . . . to indicate the origin of the goods . . . . if they gave the public clearly to understand that the goods were not simply those of the original manufacturer. . . . They have only to tell the truth, and the whole truth, and to tell it plainly.

Bumble Sherman purchased a "substantial" amount of Bumble Bee tuna in 2003 "for use in its tuna salad." As part of that application process, Sally Sherman completed and passed a Quality Assurance Survey designed to screen potential participants in the Quality Assurance Program. As the next step in the application process, Bumble Bee then scheduled an onsite inspection at Sally Sherman's facilities, but Sally Sherman withdrew its application one week later.

Sally Sherman to use the Bumble Bee mark on its tuna salad. At the end of 2002, Bumble Bee and Sally Sherman discussed the possibility that Sally Sherman would become a participant in the Quality Assurance Program, thereby allowing bearing its marks.

Sally Sherman purchased a "substantial" amount of Bumble Bee tuna in 2003 "for use in its tuna salad." (Zizis Aff. In Opp ¶ 6). In February 2004, Bumble Bee distributed to delicatessens and supermarkets its five pound tubs of Bumble Bee Tuna Salad (with the Sally Sherman logo). Made with 100% Hellmann's Real Mayonnaise (with Hellmann's logo); Made with Bumble Bee Tuna (without the Bumble Bee logo). (Compl. Ex. C; Zizis Aff. In Opp. ¶ 6). Bumble Bee had never authorized Sally Sherman to state "Made with Bumble Bee Tuna" on its lids. A photocopy of the lid attached to this Opinion and Order as Appendix A. Extensive correspondence between Bumble Bee and Sally Sherman ensued; defendant insisted it was making fair use of Bumble Bee's name, triggering this litigation.

27

RA-12

(Louis Altman ed., West Group 4th ed. 1983). This permitted use, however, must be untainted by deception:

But if the trademarked item loses its identity when incorporated into a product made by one other than the trademark owner, the trademark should not be adopted for the entire new article.... But he may, under the doctrine enunciated in *Prestonettes v. Coty*, state the nature of the component parts and their source, and he may even use the trademark of the ingredient so as to indicate its relation to the new article or combination offered by him. *He must, however, use that name discreetly and collaterally, not with an emphasis likely to lead the public into the false belief that the entire new product and the ingredient are from a common source. Such discretion also minimizes the diluting effect of defendant's use.*

*Id.* (emphasis added). Alluding to the cases discussed above, a second treatise provides identical guidance for analyzing cases such as this one:

In permitted use decisions, the courts emphasize truthful disclosure. Under appropriate circumstances, for example, a trademark ... can be truthfully used on repackaged goods sold by one other than the trademark owner if it is made clear that the goods are in fact ... repackaged, unguaranteed or otherwise varying from the trademark owner's standards. In some instances, however, deception is inherent and the use must be barred. The salient principle governing the legal propriety of using another's trademark is simply that of truthfulness and the absence of any likelihood of deception.

Beverly W. Pattishall, David C. Hilliard, & Joseph N. Welch II, *Trademarks and Unfair Competition* § 7.06[1] (2d ed. 2003). Not only do the cases and treatises trace a coherent and steady line, but the Lanham Act itself codifies this very approach.

The Lanham Act sets forth the common law defense of fair use, 15 U.S.C. § 1115(b)(4); Section 1115(b)(4) states that a trademark owner's claim that it has the exclusive right to use the mark in commerce is subject to the defense "[t]hat the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark ..., of a term or device which is descr[i]ptive of and used fairly

and in good faith only to describe the goods or services of such party...."[1]

### 2. There is No Trademark Violation Because There Is No Deception

On the one hand, Bumble Bee concedes that Sally Sherman is entitled to list in small type within the ingredients on its tuna salad lids the words "made with Bumble Bee tuna a registered trademark of Bumble Bee Seafoods, LLC not affiliated." (Tr. at 14, 45-46, 48).[2] On the other hand, Sally Sherman concedes that it cannot simply label its tuna salad with "Bumble Bee" as the brand identifier. (Zizis Aff. In Opp. Mot. ¶ 15; Tr. at 17, 22). The lid at issue presents a use of Bumble Bee's trademark that lies somewhere between those examples. "Made with Bumble Bee Tuna" is not written along with the other ingredients; nor does the label falsely state that it is Bumble Bee Tuna Salad. This Court's analysis focuses upon whether the lids are deceptive—in other words, do they lead the consumer to believe that Bumble Bee is the source of Sally Sherman's tuna salad or endorses this tuna salad?

To understand whether these lids are deceptive, this Court's analysis begins with the specific audience that will read the label's contentious phrase: "Sally Sherman Tuna Salad: Made with Bumble Bee Tuna." These labels are affixed solely on five pound tubs of tuna salad and are sold exclusively to delicatessens and supermarkets for further sale out of the deli counter. The counterman will use the Sally Sherman product to sell to the retail customer a certain weight of tuna salad or it can be used to make sandwiches for the retail customer. The lidded tubs themselves do not find their way to the ultimate consumer of the tuna salad; the tubs are sold to commercial entities whose employees remove the tuna salad from

---

[1] Though not raised by plaintiff, this Court also acknowledges a related line of cases addressing implied endorsement. This claim for trademark violation is slightly different than one grounded in confusion as to the source of the product, though consumer confusion is still the focus of the inquiry *See Oliveira v. Frito-Lay, Inc.*, No. 96 Civ. 9289, 1997 WL 324042, at *3 [46 USPQ2d 1636] (S.D.N.Y. 1998) ("The Lanham Act has been extended to cover 'misleading statements that a product or service has been endorsed by a public figure.'") (quoting *Allen v. Nat'l Video, Inc.*, 610 F.Supp. 612, 625 [226 USPQ 483] (S.D.N.Y. 1985)), *aff'd*, 251 F.3d 56 [58 USPQ2d 1767] (2d Cir. 2001).

[2] "Tr." references the transcript from the factual hearing held before this Court on April 21, 2004.

the tubs to sell it in smaller quantities to the ultimate consumer.

There is nothing in the record of this action to support the proposition that a buyer for delicatessens and supermarkets lacks the commercial familiarity and sophistication to understand that Sally Sherman makes the tuna salad, and one component of that salad is Bumble Bee Tuna. Moreover, a deli buyer must affirmatively place an order with Sally Sherman—not Bumble Bee—for this tuna salad. The law permits the use of a component owner's trademark for descriptive use provided that use is not deceptive. *See Prestonettes*, 264 U.S. 366-69; *Champion Spark Plug Co.*, 156 F.2d at 491-92. No reasonable deli buyer would be deceived after ordering tuna salad from Sally Sherman to think that instead he received Bumble Bee tuna salad.

### B. Plaintiff Does Not Have Asserted Quality Control Rights Downstream In The Market Once The Component Good Is Transferred Into A New Composite Product

Bumble Bee contends that it is entitled to supervise and indeed control the quality of third-party tuna salad that advertises that Bumble Bee's tuna is the main ingredient. Plaintiff focuses upon the line of cases where a manufacturer purchases a component product and essentially repackages it for resale in a new container. *See, e.g., Warner-Lambert Co. v. Northside Dev. Assoc.*, 86 F.3d 3 [39 USPQ2d 1136] (2d Cir. 1996); *Polymer Tech. Corp. v. Mimran*, 37 F.3d 74 [32 USPQ2d 1506] (2d Cir. 1994); *Original Appalachian Artworks, Inc. v. Granada Elec., Inc.*, 816 F.2d 68 [2 USPQ2d 1343] (2d Cir. 1987); *Eastman Kodak Co. v. Photaz Imports Ltd. Inc.*, 853 F.Supp. 667 (W.D.N.Y. 1993). Those cases address the original manufacturer's concern that its products were being resold intact—albeit in a different container without regard to quality control measures established by the product's maker. The component products were not altered in any way, nor did they become one of several ingredients somehow blended to create a composite product. The worrisome inference in those repackaging cases is that the end consumer may attribute any defect or poor quality in the product to the original manufacturer, though fault may lie with the repackager who ignored the manufacturer's quality control standards.

This action, however, is distinguishable from the repackaging cases because the inference at issue in those cases does not exist in the cases where a component ingredient of a composite product is involved. *See Prestonettes*, 264 U.S. at 368; *Champion Spark Plug Co*, 156 F.2d at 492; Callman's § 22:27; *Trademarks and Unfair Competition* § 7.06[1].

In *Forstmann Woolen Co. v. Murray Sices Corp.*, 144 F.Supp. 283 [111 USPQ 261] (S.D.N.Y. 1956), for example, the manufacturer of self-described high quality fabrics brought an action against the maker of suits—alleged to be of inferior quality relative to the fabrics—that advertised on plaintiff's fabrics. "The [suit maker] also affixed in each of its garments an additional label which clearly indicated that the garment had been manufactured by [it]." *Id.* at 290. On the claim of trademark infringement, the district court held that the suit maker was "under the doctrine of *Prestonettes*, ... entitled to inform consumers through the plaintiff's name and mark that the basic constituent of its garments was fabric manufactured by Forstmann." *Id.*

Addressing any purported unfairness arising from the fabric manufacturer's lack of control over the quality of the suits of which its fabrics were tailored, the court reasoned that quality defects in the composite product may be fairly attributed to the composite manufacturer because it has been sufficiently involved in its alteration such that its fault, to the exclusion of the component maker, may be fairly inferred:

[I]t is difficult to see how this circumstance constituted unfair competition. ... The plaintiff is not, has never claimed to be, and was not at any time believed by consumers to be, a garment manufacturer; and its label is not a symbol of a garment's classification. Thus, in the ... suits which the defendant produced, the absence of those features which customarily are found in 'better quality' suits was not and could not be attributed to the plaintiff. The consumer was clearly informed that Sices, not Forstmann, manufactured the suits and therefore was responsible for the deficiency, if any, in design, style, and workmanship. Accordingly, it was not unfair competition for Sices to inform consumers through use of the plain-

RA-13