*Id.*

tiff's name and mark that the basic fabric in its suits was [the plaintiff's].

[2] Here, Sally Sherman did not simply re-package Bumble Bee tuna, reselling it in a new container. Rather, Sally Sherman mixed and blended Bumble Bee's tuna, with more than a dozen additional ingredients, including mayonnaise, celery, flour, spices, and preser-vatives. Any adverse inference to be drawn by a consumer from poor quality tuna salad may fairly be directed toward the composite manu-facturer, not the manufacturer of the ingredi-ents. In any event, Bumble Bee may not exert [qu]ality control as its tuna swims downstream into the market place and becomes one ingredi-ent in other products, most notably tuna salad.

*C. Applying the Polaroid Factors Does Not Yield A Likelihood Of Confusion.*

To prevail on a trademark infringement claim, a plaintiff must demonstrate that the al-legedly infringing use creates a likelihood of confusion for consumers. *See Nora Bever-ages, Inc. v. Perrier Group of America, Inc.,* 269 F.3d 114, 118-19 [60 USPQ2d 1038] (2d Cir. 2001). "In this Circuit, likelihood of con-fusion is determined by the multi-factor test set out in *Polaroid Corp. v. Polarad Elec-tronics Corp.,* 287 F.2d 492, 495 [128 USPQ 411] (2d Cir. 1961)." *Id.* at 119. The non-exclusive list of *Polaroid* factors includes:

strength of [the prior owner's] mark, the de-gree of similarity between the two marks, the proximity of the products, the likeli-hood that the prior owner will bridge the gap [between the two products], actual con-fusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the so-phistication of the buyers.

*Id.* (quoting *Polaroid,* 287 F.2d at 495). It re-mains unclear whether the *Polaroid* test has [any] application in a case such as this where the Lanham Act sets forth a specific defense for [the] use of another's trademark—here, where [the] use is descriptive and used fairly and in good faith. 15 U.S.C. § 1115(b)(4).

Nonetheless, the Second Circuit has urged the application of the *Polaroid* factors when assessing a potential likelihood of confusion. *See New Kayak Pool Corp. v. R & P Pools, Inc.,* 246 F.3d 183, 185 [58 USPQ2d 1475] (2d Cir. 2001) ("'...' the law of this Circuit,

counts deciding whether a plaintiff has estab-lished likelihood of confusion must consider the eight [*Polaroid* factors].") (quoting *Arrow Fastener Co. v. Stanley Works,* 59 F.3d 384, 391 [35 USPQ2d 1449] (2d Cir. 1995)). While substantial flexibility is afforded in the appli-cation of these factors, district courts are still implored to address each factor. *See id.* ("Al-though we have recognized that the applica-tion of the *Polaroid* test need not be rigid, it is nevertheless "incumbent upon the district judge to engage in a deliberate review of each factor; and, if a factor is inapplicable to a case, to explain why.'") (quoting *Arrow Fastener Co.,* 59 F.3d at 400); *Nora Beverages, Inc.,* 269 F.3d at 119. Finally, "[n]o single *Polaroid* factor is pre-eminent, nor can the presence or absence of one without analysis of the others, determine the outcome of an infringement suit." *Id.* (quoting *Thompson Med. Co. v. Pfizer, Inc.,* 753 F.2d 208, 214 [225 USPQ 124] (2d Cir. 1985)).

[3] Here, the first and second *Polaroid* factors—the strength of the mark and the similarity of plaintiff's and defendant's marks—have no application because Sally Sherman is admittedly using Bumble Bee's actual trademark and asserts its legal right to do so.[3] Comparing the strength or similarity of that mark against itself is obviously not the purpose of the *Polaroid* test. Turning to the proximity of the goods, tuna fish and tuna salad are very closely related, so that factor favors Bumble Bee. However, there has been no evidence that Sally Sherman will "bridge the gap" by entering the tuna industry nor is there any evidence of actual confusion in this record.[4]

Addressing the intentions of Sally Sherman, Bumble Bee argues that defendant acted in "bad faith" because, preceding the creation of

---

[3] Though Sally Sherman does not use Bumble Bee's logo of a bee, the phrase "Bumble Bee" is also trade-marked. (Compl. Ex. A).

[4] Bumble Bee contends that there was actual confu-sion because Wakefern Corporation, a purchaser of Sally Sherman tuna salad, returned a substantial portion of the tuna salad because it had mistakenly believed that it had purchased Bumble Bee, not Sally Sherman, tuna salad. That contention is disingenuous: the catalyst for the return of that tuna salad was a letter that *Bumble Bee* sent to Wakefern advising that company that (a) Bumble Bee had instituted legal action against Sally Sherman to prevent distribution of their "illegal" labels and (b) warned ominously of a potential of lost revenue to Wakefern.

the label, it had been accepted into, but re-jected an offer to join, Bumble Bee Quality Assurance Program. Bumble Bee also sup-ports its bad faith claim by contending that Sally Sherman continued to produce the label despite multiple demands by Bumble Bee to cease and desist. This Court is simply not con-vinced. Sally Sherman advertised a truthful fact in an accurate manner—the source of tuna fish could be the most important factor a purchaser of tuna salad would consider in purchasing tuna salad and Bumble Bee's argu-ments about Sally Sherman's business deci-sions give no reason to think that highlighting this ingredient was in bad faith.

The quality of Sally Sherman's tuna salad is another irrelevant *Polaroid* factor as discussed above. *See Prestonettes,* 264 U.S. at 368; *Champion Spark Plug,* 156 F.2d at 492; *Forst-mann,* 144 F.Supp. at 290-91. In addition, there is nothing in the record of this action pertaining to any quality difference in the par-ties' respective products. Bumble Bee has no trademark right to control the quality of com-posite products downstream in the market, even if those products are advertised as con-taining Bumble Bee tuna as one ingredient. Finally, as this Court has already assessed, the purchasers of these five-pound tubs of tuna salad are sufficiently sophisticated to grasp the idea that one company makes the tuna and an-other takes that tuna, adds things to it, and produces an altered product called tuna salad.

Weighing each of the *Polaroid* factors and focusing on the paramount issue of potential confusion among consumers, the labels, as placed upon Sally Sherman's five-pound tubs, and as distributed to commercial entities, do not create a likelihood of confusion that Sally Sherman's tuna salad is made by Bumble Bee or that Bumble Bee endorses this tuna salad. *See Nora Beverages, Inc.,* 269 F.3d at 119 (When conducting a *Polaroid* analysis, "a court should focus on the ultimate question of whether consumers are likely to be con-fused.") (citing *Paddington Corp. v. Attiki Imps & Distrib., Inc.,* 966 F.2d 577, 584 [27 USPQ2d 1189] (2d Cir. 1993)).

CONCLUSION

Because there is no likelihood of confusion under these circumstances that Bumble Bee will be viewed as the maker or sponsor of Sally Sherman's tuna salad, and because stat-ing that Sally Sherman tuna salad is made with Bumble Bee tuna is not deceptive, plain-

tiff has not shown a likelihood of success on the merits. Moreover, plaintiff has failed to demonstrate sufficiently serious questions go-ing to the merits to make them a fair ground for litigation. Accordingly, plaintiff's motion for a preliminary injunction is denied.

SO ORDERED.

*Exhibit A*



**Boulé v. Hutton**

U.S. District Court
Southern District of New York

No. 97 Civ. 144 (MGC)

Decided June 1, 2004

**TRADEMARKS AND UNFAIR TRADE PRACTICES**

[1] Unfair competition — State and com-mon law (§ 395.03)

Plaintiff art collectors cannot succeed on their claim for violation of N.Y. Gen. Bus. Law § 349 based on statements by defendant art dealers and artist's heirs impugning au-thenticity of paintings in plaintiffs' collection, since corporate competitor bringing action un-der Section 349, which is primarily for con-sumer protection, must allege harm to public, since plaintiffs did not present evidence of consumer interest in artist's work, evidence of consumers' access to works own... 'y plain-

07/19/2004  13:39    7813314766              COSMEDICO                          _ PAGE  02

25/25/2003  23:25    7813314766              COSMEDICO                          PAGE  01





## COSMEDICO®

Cosmedico Light, Inc,
233 Libbey Pkwy., Unit 2
Weymouth, MA  02189-3101
781-331-5749 / phone
781-331-4766 / fax
jlfrank@cosmedico.com
www.cosmedico.com

PAGES 02
(incl.cover)

DATE        March 3, 2003

TO          Niels Christensen @ ASM
            Fax: 1-630-654-2984/2994

FROM        Jerry Frank
            Cosmedico Light

SUBJECT     Private Label Agreement

Niels:

The following is intended to address the major conditions of an Agreement between Cosmedico and ASM whereby Cosmedico will supply lamps that carry the RoyalSun/Cosmedico brand name.  These lamps are intended for use both as an OEM and a replacement product.

Lamp Types:  Cosmedico agrees to manufacture and inventory certain lamp types that will carry the co-branded RoyalSun/Cosmedico name.  The co-branded name will appear on both the lamp (etch) and carton label.  The initial product offering will be as shown on the chart below - but may be amended at any time by agreement between Cosmedico and ASM.

| Part # | Description | Unit Cost | Min Run |
|--------|-------------|-----------|---------|
| #12505 | Royal Sun C-Star 100W F71 B/P | | |
| #15213 | Royal Sun VLR 100W FR71 B/P | | |
| #16369 | Royal Sun VHR 160W FR71 B/P | | |
| #16371 | Royal Sun VHR 180W FR2.0M B/P | | |

Unit Prices:  Unit prices are as shown in the chart for each Lamp Type.  These prices may be reduced by Cosmedico at any time to reflect reduced cost of product and/or market conditions.  These unit prices may be increased only with the consent of ASM.

Forecast/Orders:  ASM shall provide Cosmedico with 'best effort' annual forecast for each lamp type.  This shall be updated on an 'as needed' basis - to reflect changes in demand.  ASM shall provide orders for each lamp type - but always considering the minimum run quantities as shown on the chart for each Lamp Type.

COS 817

## CONFIDENTIAL
### SUBJECT TO COURT PROTECTIVE ORDER



RA-15

03/09/2003 23:26  7813314766          COSMEDICO                    PAGE 02

Niels Christensen @ ASM
Private Label Agreement
March 3, 2003
Page 2 of 2

Attached to this Agreement is a summary of unit purchases for the corresponding Cosmedico branded types purchased by Optimatech between January 1, 2002 and December 31, 2002. This can be used as a guideline in making the ASM forecasts.

Compatibility Listings: Cosmedico will follow ASMs instructions regarding filing of compatibilities between RoyalSun and Cosmedico branded lamps except that Cosmedico will reserve the right to make these compatibility filings in the event that competitors' lamps are listed on the equipment and/or competitors lamps have been filed against the RoyalSun branded lamps (example: Original Sun is filed as compatible to RoyalSun).

Duration of Agreement: This Agreement shall remain in effect until it is cancelled in writing by either party with ninety (90) days notice.

Disposition of Inventory: Disposition of all WIP and finished goods inventory is the sole responsibility of ASM. These products may not be sold by Cosmedico to any other customers other than ASM or Optimatech unless they are abandoned by ASM.

Use of RoyalSun Lamp Trademark: Cosmedico shall be the exclusive producer of low pressure lamps bearing the RoyalSun name. ASM may source lamps from others only after this Agreement is cancelled and after all RoyalSun by Cosmedico lamps are released and paid for in full.

Regards,

Jerry Frank, President
COSMEDICO LIGHT

Date MRB, 2003

Niels Christensen, President
American Sunbed Manufacturers

Date MARCH 13, 2003

Attachment

CONFIDENTIAL
SUBJECT TO COURT PROTECTIVE ORDER

RA-16

COS 818

1

Volume I
Pages 1 to 203
Exhibits 1 to 30

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - -x
:
LIGHT SOURCES, INC., and TAN        :
SYSTEMS, INC.,                      :
            Plaintiffs,             :
                                    :   C.A. No.
        vs.                         :   303 CV 874  (MRK)
                                    :
COSMEDICO LIGHT, INC.,              :
            Defendant.              :
                                    :
- - - - - - - - - - - - - - - - - -x

        CONFIDENTIAL DEPOSITION OF COSMEDICO LIGHT,
INC., THROUGH ITS DESIGNEE, JOSEPH J. FRANK, a
witness called on behalf of the Plaintiffs, taken
pursuant to Rule 30(b)(6) of the Federal Rules of
Civil Procedure, before Ken A. DiFraia, Registered
Professional Reporter and Notary Public in and for
the Commonwealth of Massachusetts, at the Offices of
Banner & Witcoff, LTD., 28 State Street, Boston,
Massachusetts, on Monday, July 19, 2004, commencing
at 10:07 a.m.

PRESENT:

    Fattibene and Fattibene
        (by Arthur Fattibene, Esq., and
        Paul A. Fattibene, Esq.)
        2480 Post Road, Southport, CT 06890,
        for the Plaintiffs.

    Banner & Witcoff, LTD.
        (by Dale A. Malone, Esq.)
        28 State Street, Boston, MA 02109-1775,
        for the Defendant.

                *  *  *  *  *

A Full-Service Court Reporting Firm
50 Franklin Street
Boston, Massachusetts 02110
(617) 426-2432 ~ Fax (617) 482-7813

WONG Associates, Inc.
Professional Court Reporters
Since 19

RA -17

191

1        MR. FATTIBENE:  Let's take a break.

2        (Recess)

3                (Document marked as Frank

4                Exhibit 30 for identification)

5    BY MR. FATTIBENE:

6    Q.    Can you identify Exhibit 30?

7    A.    (Examines document)  Yes.

8    Q.    What is it?

9    A.    It's an agreement that I made with a

10   company called "ASM."

11   Q.    Paragraph 2 on Page 1 says that this

12   agreement may be amended at any time by agreement

13   between Cosmedico and ASM.  Have any amendments been

14   made to this agreement?

15   A.    No.  Where does it say that?

16   Q.    Right in the second paragraph on the first

17   page.

18   A.    No amendments have been made.

19   Q.    What is the etching that is placed on the

20   lamps which Cosmedico OEM's to ASM as per this

21   agreement?

22        MR. MALONE:  Objection.  That

23   mischaracterizes the prior testimony.

24   A.    What do the etches say?

RA-18

192

1        Q.    Right.

2        A.    The etches read as they are stated, Royal

3    Sun VLR, Royal Sun VHR, Royal Sun VHR.  I believe

4    the Royal Sun C-Star is an abbreviation for

5    CosmoStar.  I think the lamp is a CosmoStar.  I

6    don't remember exactly what's on the etches except

7    that...

8            MR. FATTIBENE:  Can I request copies of

9    those etchings.

10           MR. MALONE:  What would that be relevant

11   to?

12           MR. FATTIBENE:  It may go to the validity

13   of the trademark.

14           MR. MALONE:  I'll take that under

15   advisement.

16           MR. FATTIBENE:  But I'm requesting them.

17           MR. MALONE:  I understand.

18       Q.    The fact that a lamp is considered to be a

19   compatible lamp, does that have any bearing on

20   whether or not one lamp can be confused with the

21   other?

22           MR. MALONE:  Object to the form of the

23   question.  Considered compatible by whom?

24           MR. FATTIBENE:  By the FDA.

RA-19

00195

```
 1   lamp?
 2          MR. MALONE:  Objection, calls for
 3   speculation.
 4      A.    I don't know that a compatibility filing in
 5   itself adds confusion, whether that compatibility
 6   filing is correct or not.
 7      Q.    Looking at the last paragraph of Exhibit
 8   No. 30, can you explain for me what Cosmedico's
 9   understanding of that paragraph is.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

MATERIAL
REDACTED

RA-20

00196

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

MATERIAL
REDACTED

RA-21

00197

```
1        Q.    How long have they been using it for their
2   equipment?
3        A.    Many years.
4        Q.    What do you call "many"?
5        A.    More than eight years.
6        Q.    How long have they been using it on lamps?
7        A.    After March 3, 2003.
8        Q.    That's the date of this agreement?
9        A.    Yes.
10
11   t
12             MR. MALONE:  Objection, asked and answered.
13
14              MALONE:  Are you about done, Counsel?
15        MR. FATTIBENE:  Pretty soon.  I want to get
16   this understanding down.
17             MR. MALONE:  For the record, it's 6:22 p.m.
18   now.  We are well over the allotted seven hours that
19   you are entitled to under the federal rules, as you
20   know.
21             MR. FATTIBENE:  We didn't start until ten.
22   We quit at one, started around two.
23             MR. MALONE:  That's more than seven hours.
24   We will give you a few more minutes to wrap up.  We
```

MATERIAL REDACTED

RA-22

00198

1  hope you would extend the same courtesy to me
2  tomorrow.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

MATERIAL
REDACTED

CONFIDENTIAL
ATTORNEYS EYES ONLY

RA-23

199

1    is canceled?

2         A.    Which are my trademarks?

3         Q.    Royal Sun.

4         A.    No.

5         Q.    Well, then if I understand your testimony

6    correctly, I'm getting two answers here.  They

7    either can use Royal Sun after the termination of

8    this agreement or they cannot.

9              MR. MALONE:  That's not the universe of

10   possibilities here.

11        A.    They cannot use Royal Sun as a name on a

12   low pressure sunlamp after the termination of this

13   agreement.

14        Q.    Who could use the name "Royal Sun" on a low

15   pressure lamp after the termination of this

16   agreement?

17        A.    No one can.

18        Q.    No one?

19        A.    No one.

20        Q.    Why not?

21        A.    Because they have not given me the right to

22   do it via this agreement.  We have just -- they just

23   don't have the right to continue with the Royal Sun

24   name if I'm not the low pressure lamp supplier.  I

RA-24

200

1    don't have the right to use their trademark.  They

2    cannot continue with Royal Sun on a lamp.

3        Q.    Could Cosmedico continue manufacturing a

4    lamp after this agreement is terminated with a Royal

5    Sun mark on it?

6            MR. MALONE:  Objection, asked and answered.

7    He just explained that.

8        A.    Not by my understanding of the agreement.

9    That was not the intent of the agreement.

10       Q.    What was not the intent of the agreement?

11       A.    For me to use Royal Sun should they decide

12   not to have me provide the lamps in the future.

13       Q.    If I understand your testimony, neither

14   Cosmedico or ASM could use the mark Royal Sun?

15           MR. MALONE:  Asked and answered.

16       A.    Correct.

17       Q.    Then it could be grabbed by anyone else

18   that wants to adopt the name?

19           MR. MALONE:  Objection, calls for

20   speculation, calls for a legal conclusion, assumes

21   facts not in evidence.

22       A.    I can't answer that.  Royal Sun would have

23   to answer that.  ASM would have to answer that.

24           MR. FATTIBENE:  I'm going to adjourn the

RA-25

201

1    deposition at this point pending any necessary

2    ruling for failure to produce some of the documents

3    that were requested if they exist.

4                MR. MALONE:  I have no questions for the

5    witness at this time.

6                        (Whereupon the deposition

7                        was adjourned at 6:26 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

RA-26